UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
                                                            :
UNITED STATES OF AMERICA,                                   :
                                                            :
            -v-                                             :               21 Cr. 40 (JPC)
                                                            :
RAUL GUTIERREZ-CAMPOS,                                      :               OPINION AND ORDER
                                                            :
                        Defendant.                          :
                                                            :
-------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

    Defendant Raul Gutierrez-Campos is charged in an Information with one count of illegal

reentry, in violation of 8 U.S.C. §§ 1326(a) and 1326(b)(2).  He has moved to dismiss the

Information, raising various arguments to collaterally challenge the validity of the removal order

issued at his immigration court proceedings in July 2000.  Defendant first argues that the removal

order was invalid because certain defects in the initial Notice to Appear deprived the immigration

judge of jurisdiction.  He further contends that his removal proceedings violated due process

because the immigration judge failed to afford him the opportunity to apply for voluntary

departure.  And but for that error, Defendant argues, there was a reasonable probability that he

would have sought and been granted voluntary departure.

    As discussed in further detail below, the Court finds that the immigration judge who

presided over Defendant's removal proceedings had authority to enter the removal order.  But

because the Court finds that the New York statute under which Defendant was convicted

criminalizes narcotics activity involving cocaine isomers that are not covered by the federal

definition of controlled substances, his New York conviction did not qualify as an aggravated

felony under the immigration laws at the time of his removal proceedings.  Defendant therefore

was eligible to seek voluntary departure in immigration court.  While Defendant did not seek

administrative or judicial appeal of the question of his eligibility for voluntary departure, Second Circuit precedent excuses that failure to exhaust because Defendant did not knowingly and intelligently waive his right to appeal.  The Court also finds that there is a reasonable probability that Defendant would have sought and received voluntary departure from the immigration court. Because that relief would prevent the Government from satisfying an element of a section 1326(a) offense, Defendant's motion to dismiss the Information is granted.

## I. Background

### A.  Facts

The parties do not dispute the relevant facts.[1]  Defendant is a citizen of Mexico who came to the United States as a child in approximately 1985 or 1986.  Wheeler Declaration, Exh. A ("Gutierrez-Campos Declaration") ¶ 4.  For years, Defendant lived in the United States without lawful authority to do so.  Opposition at 2.  He was arrested in 1998 and charged in New York state court with criminal sale of a controlled substance on school grounds and criminal possession of a controlled substance in the third degree.  *Id.* at 3.  In February 1999, Defendant pleaded guilty in New York County Supreme Court to attempted criminal sale of a controlled substance in the third degree, in violation of New York Penal Law sections 110 and 220.39.  Motion at 3; *see* Wheeler Declaration, Exh. B.  Defendant absconded after pleading guilty and was arrested on a bench warrant in November 1999.  Opposition at 3.  On December 20, 1999, Defendant was sentenced to one year in prison (the "New York Conviction").  Wheeler Declaration, Exh. B.

---

[1] The following facts are drawn primarily from the Memorandum of Law in Support of Defendant's Motion to Dismiss, Dkt. 20-1 ("Motion"); the Declaration of S. Isaac Wheeler, Dkt. 20 ("Wheeler Declaration"); exhibits attached to the Wheeler Declaration; the transcript with translation from Defendant's removal hearing, Dkt. 55-1; and the Government's Memorandum of Law in Opposition to Defendant's Motion to Dismiss, Dkt. 32 ("Opposition").

Defendant's judgment of conviction for the New York Conviction indicates that he was convicted of attempting to sell cocaine. *Id.*

While detained in state custody for the New York Conviction, Defendant was interviewed by an officer with the former Immigration and Naturalization Service ("INS"), who determined that Defendant's conviction for attempted sale of cocaine qualified as an "aggravated felony" and lodged a detainer with the New York City Department of Corrections.[2]  Motion at 3; Opposition at 3; Wheeler Declaration, Exhs. C, D.  On December 28, 1999, Defendant requested a hearing before the immigration court to determine whether he may remain in the United States.  Wheeler Declaration, Exh. C.  On January 31, 2000, an INS officer prepared and signed a Form I-862, captioned "Notice to Appear," which directed Defendant "to appear before an immigration judge of the United States Department of Justice." *Id.*, Exh. E at 1.  The Notice to Appear did not identify a specific location, date, or time for that appearance, and instead indicated that such information was to be calendared and notice was to be provided by the Office of the Immigration Judge. *Id.*

The Notice to Appear alleged, *inter alia*, that Defendant is not a citizen of the United States, that he entered the United States without inspection, and that he was convicted in 1999 of

---

[2] Defendant's Form I-213, captioned "Record of Deportable/Inadmissible Alien," stated: "AGGRAVATED FEL: Yes (Not Charged)."  Wheeler Declaration, Exh. C.  A conviction that constitutes an "aggravated felony" under federal immigration law carries a number of consequences, including barring relief from removal and subjecting the noncitizen to mandatory detention pending removal.  It appears that the reason Defendant's Form I-213 was marked as "Not Charged" for an aggravated felony is that Defendant could not be charged directly with being convicted of an "aggravated felony" as the basis for his removal.  Title 8, United States Code, section 1227(a)(2)(A)(iii) addresses the removal of those convicted of an aggravated felony, but only following lawful admission into the United States. *See* 8 U.S.C. § 1227(a)(2)(A)(iii) ("Any alien who is convicted of an aggravated felony at any time *after admission* is deportable." (emphasis added)).  Because Defendant was not lawfully admitted to the United States, he could not have been charged under section 1227(a)(2)(A)(iii), and instead he was removed pursuant to different provisions of the INA that apply to inadmissible aliens.  Wheeler Declaration, Exh. E; *see* 8 U.S.C. § 1182(a)(2)(A)(i)(II), (a)(6)(A)(i).

attempted criminal sale of a controlled substance (*i.e.*, cocaine) in the third degree in New York

state court. *Id.* at 2.  On the basis of those allegations, the Notice to Appear charged Defendant as

removable from the United States under section 212(a)(6)(A)(i) of the Immigration and Nationality

Act ("INA"), 8 U.S.C. § 1182(a)(6)(A)(i), as a person present in the United States "without being

admitted or paroled," and under section 212(a)(2)(A)(i)(II) of the INA, 8 U.S.C.

§ 1182(a)(2)(A)(i)(II), "as an alien who has been convicted of . . . a violation or a conspiracy or

attempt to violate any law or regulation . . . relating to a controlled substance (as defined in section

102 of the Controlled Substances Act, 21 U.S.C. 802)."  Wheeler Declaration, Exh. E at 2.

    After completing his sentence for the New York Conviction, Defendant was transferred to

INS custody and was served with a copy of a warrant for his arrest, along with a form advising

that he would be detained pending his removal proceedings and any removal. *Id.*, Exh. F.  An

undated Form I-830, captioned "Notice to EOIR: Alien Address," informed the immigration court

in Oakdale, Louisiana, that Defendant was being detained by INS at the Federal Detention Center

in Oakdale.  *Id.*, Exh. H.  The Form I-830 also stated that the "[c]harging document will be filed

with the [Office of the Immigration Judge] in Oakdale, LA" and that a "[c]opy of this form has

been given to [Defendant] for notification of jurisdiction/commencement of proceedings as

required per CFR 3.14." *Id.*  On July 13, 2000, the Oakdale immigration court served on Defendant

via mail a Notice of Hearing in Removal Proceedings informing him that "a hearing in this case is

scheduled/rescheduled before an Immigration Court on Jul[y] 18, 2000 at 1:00 P.M. at 1900 E.

Whatley Road, Oakdale, LA 71463" and that "any motions . . . , applications, or other

correspondence concerning this case should be filed with the Immigration Court at: 1900 E.

Whatley Road, Oakdale, LA 71463." *Id.*, Exh. I.  According to the receipt stamp, this Notice of

Hearing was received by "INS-Litigation Oakdale, LA" on July 14, 2000, at 10:03 a.m. *Id.*

On July 18, 2000, Defendant appeared in person for a removal hearing before an immigration judge (the "IJ").   Wheeler Declaration ¶¶ 16-17, Exhs. J, K.   The hearing was conducted in English with the assistance of a Spanish-language interpreter.   *Id.*, Exh. K (recording); Dkt. 55-1 (transcript with translation).   At the start of the hearing, the IJ advised Defendant that he may request more time to better prepare his case or to seek an attorney, or he may proceed with the hearing at that time.   *Id.*  Defendant responded: "I wish to sign the papers to leave the country."   *Id.*   The IJ then explained the nature of immigration court and advised Defendant of his right to counsel and to appeal an adverse decision to the Board of Immigration Appeals ("BIA") and to the federal courts.   *Id.*  Defendant responded "yes" in acknowledgement. *Id.*   The IJ also confirmed service and receipt of Defendant's immigration forms, including the Notice to Appear, the notice of appeal form, and proof of his conviction.   *Id.*  Defendant, once again, responded "yes."   *Id.*

Defendant then admitted to the factual allegations in the Notice to Appear, including that he was "convicted for attempted sale of cocaine" in 1999 in New York.   *Id.*  Based on Defendant's acknowledgements and admissions, the IJ found Defendant "removable as charged."   *Id.* Defendant informed the IJ that he wished to be removed to Mexico.   *Id.*  The IJ inquired whether the Government was aware of any relief available to Defendant, to which the Government responded "no."   *Id.*  After ordering Defendant removed to Mexico, the IJ asked Defendant whether he understood the decision.   *Id.*  Defendant responded "yes."   *Id.*  The IJ asked Defendant whether he wished to appeal the IJ's decision.   *Id.*   Defendant answered "no."   *Id.*; *see also* Wheeler Declaration, Exh. L (IJ's order of removal indicating appeal was waived).   At no point during the removal hearing did the IJ advise Defendant of the availability of a discretionary form of relief from removal called voluntary departure.   Gutierrez-Campos Declaration ¶ 8; Wheeler

Declaration, Exh. K; Dkt. 55-1.  Defendant contends that had he been aware of the possibility of voluntary departure, he would have sought that relief.  Gutierrez-Campos Declaration ¶ 8.

Defendant was removed to Mexico on July 25, 2000.  Opposition at 6.  The Government alleges that, sometime following his removal, Defendant returned to the United States and, on February 1, 2020, Defendant was arrested in the Bronx for assault in the third degree, in violation of New York Penal Law section 120.00(1).  Dkt. 1 ¶ 4.

### B.  Procedural History

On October 19, 2020, Defendant was charged in a criminal complaint with illegal reentry in violation of 8 U.S.C. §§ 1326(a) and 1326(b)(2) and an arrest warrant was issued.  Dkts. 1, 2. He was arrested on December 1, 2020 by federal authorities, and, on January 19, 2021, he waived indictment and pleaded not guilty to an Information that charged him with one count of illegal reentry.  Dkts. 7, 8, 12.

On April 16, 2021, Defendant moved to dismiss the Information on the ground that the IJ's order of removal was invalid.  Defendant argues that the immigration court lacked jurisdiction to order his removal because of deficiencies in the Notice to Appear.  He further contends that the New York Conviction did not qualify as an aggravated felony under the INA because the relevant New York statute criminalized a broader scope of cocaine isomers than federal law.  Therefore, Defendant contends, he was eligible to apply for voluntary departure, yet the IJ did not afford him the opportunity to do so.  The Government filed its Opposition to Defendant's Motion on June 21, 2021, and Defendant filed his reply on August 27, 2021, Dkt. 40.  The Government and Defendant, respectively, also filed a sur-reply, Dkt. 42, and a sur-sur-reply, Dkt. 47, on the cocaine isomer issue, and the parties submitted additional briefing on other issues implicated in Defendant's Motion, including the impact of the Supreme Court's 2021 decision in *United States v. Palomar-*

*Santiago*, 141 S. Ct. 1615 (2021), on Defendant's failure to satisfy certain requirements of 8 U.S.C. § 1326(d), *see* Dkts. 49-50, 54-55.[3]   The Court held oral argument on November 4, 2021.  Dkt. 51.

## II. Legal Standard

Under Rule 12(b)(3)(B) of the Federal Rules of Criminal Procedure, a defendant may move to dismiss an information due to a defect, including for failure to state an offense. Fed. R. Crim. P. 12(b)(3)(B)(v).  A defendant may attack an illegal reentry charge by collaterally challenging the validity of the underlying removal order upon which the charge is predicated.  *United States v. Copeland*, 376 F.3d 61, 66 (2d Cir. 2004); *see also United States v. Taveras*, 504 F. Supp. 3d 272, 278 (S.D.N.Y. 2020) ("An element of the offense of illegal reentry after deportation or removal in violation of 8 U.S.C. § 1326 is that the defendant was previously deported in such a manner that complied with due process.").  The mechanism for challenging the validity of a prior removal order, which was first articulated by the Supreme Court in *United States v. Mendoza-Lopez*, 481 U.S. 828, 837-39 (1987), has been codified at 8 U.S.C. § 1326(d).

Under section 1326(d), a defendant seeking to collaterally attack an underlying removal order must demonstrate that (1) the defendant "exhausted any administrative remedies that may have been available to seek relief against the order," (2) the prior deportation proceedings "deprived [the defendant] of the opportunity for judicial review," and (3) "[t]he entry of the order was fundamentally unfair."  8 U.S.C. § 1326(d).  Each of the statute's three requirements are mandatory and must be satisfied.  *Palomar-Santiago*, 141 S. Ct. at 1620-21 ("The requirements are connected by the conjunctive 'and,' meaning defendants must meet all three."); *accord United States v. Fernandez-Antonia*, 278 F.3d 150, 157 (2d Cir. 2002).

---

[3] The Court pauses to commend both sides for their thorough and excellent briefing on the various complicated issues raised in Defendant's Motion.

### III. Discussion

**A.  The Immigration Court's Jurisdiction**

The Court begins with Defendant's jurisdictional arguments.  Title 8, United States Code, section 1229a authorizes an immigration judge to "conduct proceedings for deciding the inadmissibility or deportability of an alien."  8 U.S.C. § 1229a(a)(1).  Section 1229 provides that in removal proceedings under section 1229a, a written notice must be provided to a noncitizen, known as a "notice to appear," that contains certain categories of information, including, as relevant here, "[t]he time and place at which the proceedings will be held."   8 U.S.C. § 1229(a)(1)(G)(i).  As the Second Circuit observed in *Banegas Gomez v. Barr*, 922 F.3d 101 (2d Cir. 2019), section 1229 does not "explain when or how jurisdiction vests with the immigration judge" or "denote which of the several requirements for [notices to appear] listed in § 1229(a)(1) are jurisdictional," and, in fact, does not say anything about the immigration court's jurisdiction. *Id.* at 110-11 (quotations omitted).

The regulations promulgated under section 1229(a), however, "*do* address when jurisdiction vests in the Immigration Court." *Id.* at 111.  These regulations state that "[j]urisdiction vests, and proceedings before an Immigration Judge commence, when a charging document is filed with the Immigration Court by the Service."  8 C.F.R. § 1003.14(a).  They further provide that "[t]he charging document must include a certificate showing service on the opposing party pursuant to § 1003.32 which indicates the Immigration Court in which the charging document is filed." *Id.*  The term "charging document" is defined as "the written instrument which initiates a proceeding before an Immigration Judge," including a notice to appear.  *Id.* § 1003.13.  The regulations require the notice to appear to include, as relevant here, "[t]he address of the Immigration Court where the Service will file . . . [the] Notice to Appear."  *Id.* § 1003.15(b)(6).

The regulations further require the notice to appear to provide the date, time, and place of the initial removal hearing, but only "where practicable"; otherwise, the immigration court must schedule the removal hearing and provide notice to the Government and the noncitizen of the date, time, and location of that hearing. *Id.* § 1003.18(b).

Defendant contends that the IJ lacked jurisdiction to order his removal because the Notice to Appear was deficient in two ways. First, the Notice to Appear lacked the date and time of his initial hearing. Motion at 32-39. Second, the Notice to Appear did not indicate the address of the immigration court where the Notice was to be filed. *Id.* at 23-32.

### 1. Date and Time of the Removal Hearing

Defendant's argument that the IJ lacked jurisdiction because the initial Notice to Appear did not include the date and time of the removal hearing is foreclosed by Second Circuit precedent. In *Banegas Gomez*, the Second Circuit addressed this very question: whether a notice to appear that fails to specify the date and time of a noncitizen's removal hearing is legally defective such that jurisdiction never vested in the immigration court. 922 F.3d at 104, 110. Under *Banegas Gomez*, and as recently affirmed by the Second Circuit in *Chery v. Garland*, 16 F.4th 980 (2d Cir. 2021), a notice to appear that lacks such date and time information does not deprive the immigration court of jurisdiction, provided that a hearing notice with that information is later provided to the noncitizen.

The noncitizen petitioner in *Banegas Gomez* sought review of the BIA's affirmance of the immigration judge's decision finding him removable and denying his application for relief from removal. The petitioner argued, among other things, that the immigration court lacked jurisdiction over his removal proceedings because his notice to appear did not include the date and time of his initial removal hearing. *Banegas Gomez*, 922 F.3d at 110. In support of his position, the petitioner

relied on the Supreme Court's decision in *Pereira v. Sessions*, 138 S. Ct. 2105 (2018), which considered whether service of a notice to appear that omits reference to the time or place of the initial hearing triggers the "stop-time rule" for cancellation of removal under the INA. Section 1229b allows for discretionary relief of cancellation of removal for nonpermanent residents who establish, among other things, their continuous presence in the United States for at least 10 years. 8 U.S.C. § 1229b(b)(1)(A). However, calculation of that continuous presence ends (except for cancellation applications for battered spouses or children) upon service of a notice to appear, which is known as the "stop-time rule." *Id.* § 1229b(d)(1). The *Pereira* Court held that because this stop-time rule "expressly" provides that it is triggered by service of a notice to appear "under section 1229(a)," and section 1229(a) specifies that a notice to appear shall state the time and place at which proceedings will be held, *see id.* § 1229(a)(1)(G)(i), a notice to appear must include such information to trigger the stop-time rule. *Pereira*, 138 S. Ct. at 2114.

The Second Circuit in *Banegas Gomez* declined to extend *Pereira* to void an immigration court's jurisdiction where the notice to appear lacked the date and time information, finding *Pereira*'s holding to be limited to the "narrow question" of the requirements of section 1229(a) for purposes of the stop-time rule. *Banegas Gomez*, 922 F.3d at 110, 112 n.2 ("We do not believe the Supreme Court would have deemed its holding 'narrow' if *Pereira* had the far-reaching jurisdictional consequences Banegas Gomez's reading of that decision would portend."). Moreover, the Second Circuit observed that the plain language of the regulations—unlike in the context of the stop-time rule—neither "refer to § 1229(a)(1)'s requirements when defining what [a notice to appear] is for purposes of vesting jurisdiction in the Immigration Court," nor require that a notice to appear contain the date, time, and place of a hearing, except "where practicable." *Id.* at 111. For these reasons, the Second Circuit concluded that a notice to appear "that omits

information regarding the time and date of the initial removal hearing is nevertheless adequate to vest jurisdiction in the Immigration Court, at least *so long as a notice of hearing specifying this information is later sent to the alien*." *Id.* at 112 (emphasis added); *see also In re Bermudez-Cota*, 27 I. & N. Dec. 441, 447 (B.I.A. 2018) ("[A] notice to appear that does not specify the time and place of an alien's initial removal hearing vests an Immigration Judge with jurisdiction over the removal proceedings and meets the requirements of [section 1229(a)], so long as a notice of hearing specifying this information is later sent to the alien."); *Taveras*, 504 F. Supp. 3d at 281 (holding that *Banegas Gomez* foreclosed the defendant's claim that the immigration court lacked jurisdiction over his removal hearing because, even though the initial notice to appear did not include the date and time of the hearing, a subsequent "Notice of Hearing in Removal Proceedings" sent four months later included that information).

Most recently, in *Chery*, the Second Circuit revisited *Banegas Gomez* in light of the Supreme Court's holding in *Niz-Chavez v. Garland*, 141 S. Ct. 1474 (2021), that a notice to appear must include all required information, including the date, time, and location of the removal hearing, in a single document in order to trigger the stop-time rule. Reiterating that *Banegas Gomez* "remains good law," the Second Circuit held that the holding in *Niz-Chavez* was limited to "the stop-time rule in 8 U.S.C. § 1229b(d)(1) and did not address the effect of a defective [notice to appear] on an IJ's jurisdiction." *Chery*, 16 F.4th at 987.

Here, the Notice to Appear sent to Defendant on January 31, 2000 lacked the date, time, and location of his initial removal hearing. Yet, on July 13, 2000, the Oakdale Immigration Court mailed a Notice of Hearing in Removal Proceedings to Defendant, which Defendant received on or around July 14, 2000. Wheeler Declaration, Exh. I. In accordance with 8 C.F.R. § 1003.18(b), the July 2000 Notice of Hearing included information regarding the date, time, and location of

Defendant's initial hearing in immigration court.  *See id.* (the July 2000 notice informing Defendant that "a hearing in this case is scheduled/rescheduled before an Immigration Court on Jul[y] 18, 2000 at 1:00 P.M. at 1900 E. Whatley Road, Oakdale, LA 71463").  Therefore, under the Second Circuit's decisions in *Banegas Gomez* and *Chery*, any defect in the initial Notice to Appear due to lack of information regarding the date, time, and location of the initial removal hearing was cured by the subsequent Notice of Hearing sent to Defendant in July 2000.  Indeed, Defendant concedes that *Chery* and *Banegas Gomez* "foreclose[] one discrete part of [Defendant]'s argument before this Court that the IJ in this case lacked jurisdiction." Dkt. 49 at 1-2.  Accordingly, the IJ had authority to issue the removal order, notwithstanding the absence in the Notice to Appear of the date, time, and location of Defendant's initial hearing.

### 2.  Address of the Immigration Court

Defendant also argues that the Notice to Appear was deficient for the separate reason that it did not include the address of the immigration court where the Notice to Appear was to be filed. Defendant contends that "[u]nlike time and date information, this information *is* required to be included in every notice to appear under *both* the statute, 8 U.S.C. § 1229(a)(1)(g)(i) *and* the regulations, 8 C.F.R. § 1003.15(b)(6)." Motion at 39.  Specifically, Defendant notes that whereas section 1003.18(b) provides that the date, time, and place of a hearing shall be provided only "where practicable," section 1003.15(b)(6) does not have a similar practicability exception for the address requirement.  Motion at 27-29.  Rather, section 1003.15(b)(6) provides, as relevant here, that the "Notice to Appear must also include . . . [t]he address of the Immigration Court where the Service will file the . . . Notice to Appear."  8 C.F.R. § 1003.15(b)(6).  Defendant likewise maintains that this argument is not foreclosed by *Banegas Gomez*, which only addressed situations where a notice to appear lacks information concerning the hearing's date and time.  Motion at 39.

12

The Court concludes that the requirements of section 1003.15(b)(6) do not implicate the immigration court's subject matter jurisdiction.  In this regard, the Court finds persuasive decisions of various Circuits and the BIA, holding that the regulations at issue here are "claim-processing," not jurisdictional, rules.  *See Lopez-Munoz v. Barr*, 941 F.3d 1013, 1016 (10th Cir. 2019) (recognizing that "[b]ecause the Attorney General could not restrict an immigration judge's jurisdiction through a regulation, 8 C.F.R. § 1003.14 does not establish immigration judges' jurisdiction"); *Perez-Sanchez v. U.S. Att'y Gen.*, 935 F.3d 1148, 1155 (11th Cir. 2019) (holding that the requirements in 8 C.F.R. § 1003.14 are "not a jurisdictional rule but a claim-processing one" because "[p]rinciples of administrative law dictate that an agency cannot define its own authority to hear cases; only Congress can"); *United States v. Cortez*, 930 F.3d 350, 358 (4th Cir. 2019) ("The regulation on which Cortez relies, 8 C.F.R. § 1003.14(a), is an internal docketing rule, not a limit on an immigration court's 'jurisdiction' or authority to act."); *In re Rosales Vargas*, 27 I. & N. Dec. 745, 746-47 (B.I.A. 2020) (holding that the requirements of sections 1003.14(a) and 1003.15(b)(6) are "'claim-processing' or 'internal docketing' rules, which do not implicate subject matter jurisdiction").

The BIA undertook a careful analysis of this issue in *In re Rosales Vargas*.  There, the BIA found that, although section 1003.14 is titled "Jurisdiction and commencement of proceedings" and includes the words "jurisdiction vests when a charging document is filed," "it provides no other specifications regarding the scope of the document," including what information must be contained in a "charging document" at the time it is filed with an immigration court.  *Id.* at 748. The BIA also concluded that the term "jurisdiction" as used in section 1003.14(a) does not implicate subject matter jurisdiction.  *See id.* at 752 (observing that "jurisdiction" can refer to "subject matter jurisdiction," which "defines a court's power to decide a case, to which objections

cannot be waived," but that it can also refer to "a claim-processing rule that does not alter a court's power or authority to hear a case, to which objections can be forfeited or waived"). Rather, "[t]he regulatory history shows that 8 C.F.R. § 1003.14 and the related regulations, including § 1003.15, were promulgated as procedural rules for the Immigration Courts . . . to outline the steps needed to docket a case in a particular Immigration Court and to ensure the efficient administrative handling of cases within the Executive Office for Immigration Review." *Id.*; *see also United States v. Rivera Lopez*, 355 F. Supp. 3d 428, 439 (E.D. Va. 2018) (observing that section 1003.14(a) is "focused not on the immigration court's fundamental power to act but rather on 'requiring that the parties take certain procedural steps at certain specified times,' which weighs in favor of finding that the requirement is more like a 'claim-processing' rule than a genuine jurisdictional requirement" (quoting *Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 435-36 (2011))).

The BIA similarly concluded that nothing in the text of section 1003.15(b)(6) "mandates that the address of the Immigration Court is a jurisdictional requirement or that it cannot be provided subsequent to the service of the notice to appear." *In re Rosales Vargas*, 27 I. & N. Dec. at 749. Instead, section 1003.15(b)(6)—read in conjunction with other regulations and viewed in light of its regulatory history—also sets forth "'claim-processing' or 'internal docketing' rules that are intended to provide aliens with notice of the location of their hearings and to facilitate communication with the court where the DHS anticipates filing the notice to appear." *Id.*; *see also* 8 C.F.R. § 1003.12 (entitled "Scope of rules," providing that "[t]hese rules"—including section 1003.15(b)(6)—"are promulgated to assist in the expeditious, fair, and proper resolution of matters coming before Immigration Judges"). The BIA particularly considered section 1003.15(b)(6) in conjunction with section 1003.18(b), which, as noted above, permits a notice to appear lacking the "time, place and date of the initial removal hearing" to be cured by subsequent notice containing

14

such information.  The BIA reasoned that section 1003.15(b)(6) similarly "anticipates that when the address of the Immigration Court is not included in the notice to appear, the court can provide notice of that information at a later time," in which scenario the noncitizen "is not deprived of any fundamental information regarding where to appear for a hearing or to file documents."  *In re Rosales Vargas*, 27 I. & N. Dec. at 750; *see Taveras*, 504 F. Supp. 3d at 282 (comparing sections 1003.18(b) and 1003.15(b)(6), and extending "the logic of" *Banegas Gomez* to hold that an initial notice to appear that lacked the immigration court's address did not deprive that court of jurisdiction).

Defendant argues that the out-of-Circuit decisions that have held that the requirements of sections 1003.14(a) and 1003.15(b)(6) are "claim-processing rules," and thus do not implicate subject matter jurisdiction, are inconsistent with the Second Circuit's description of those requirements in *Banegas Gomez* as "jurisdictional."  Motion at 27.  The Court disagrees.  Although the Second Circuit in *Banegas Gomez* did examine the regulations at issue in assessing when "jurisdiction vests" in the immigration court, 922 F.3d at 110-11, it did not specify, in employing the term "jurisdiction," that it was referring to the "subject matter jurisdiction" of the immigration court, *see Union Pac. R.R. Co. v. Bhd. of Locomotive Eng'rs & Trainmen Gen. Comm. of Adjustment*, 558 U.S. 67, 81 (2009) (noting "that the word 'jurisdiction' has been used by courts, including this Court, to convey 'many . . . meanings'"); *see also City of Arlington v. F.C.C.*, 569 U.S. 290, 297 (2013) (cautioning against "reflexive[ly] exten[ding] to agencies of the very real division between the jurisdictional and nonjurisdictional that is applicable to courts" since "[b]oth their power to act and how they are to act is authoritatively prescribed by Congress, so that when they act improperly, no less than when they act beyond their jurisdiction, what they do is ultra vires").  As discussed above, while the use of the term "jurisdiction" may invoke "subject matter

jurisdiction," which "refers to a tribunal's 'power to hear a case,' a matter that 'can never be forfeited or waived,'" the term also can refer to a "claim-processing rule," which "does not reduce the adjudicatory domain of a tribunal and is ordinarily 'forfeited if the party asserting the rule waits too long to raise the point.'" *Union Pac. R.R. Co.*, 558 U.S. at 81-82 (first quoting *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 510 (2006); and then quoting *Kontrick v. Ryan*, 540 U.S. 443, 456 (2004)).

This distinction is particularly significant in the context of immigration courts. Unlike an Article III court, which "ha[s] an unwavering duty to ensure that [it] ha[s] subject matter jurisdiction over a case," an immigration court is an Article I court that is "responsible for enforcing the immigration laws, and one in which arguments about the power of the court may be forfeited." *Campos-Luna v. Lynch*, 643 F. App'x 540, 542-43 (6th Cir. 2016) (citations omitted). Thus, in reviewing the immigration court's actions, "the inquiry turns not on whether it incorrectly determined it had jurisdiction but instead on 'whether the agency has gone beyond what Congress has permitted it to do.'" *Id.* (quoting *City of Arlington*, 569 U.S. at 298); *see also City of Arlington*, 569 U.S. at 297-98 (observing that in challenging agency action, "there is no principled basis for carving out some arbitrary subset of such claims as 'jurisdictional'"). This makes sense. As the Fourth Circuit observed in *Cortez*, "the immigration courts' adjudicatory authority over removal proceedings comes not from the agency regulation codified at 8 C.F.R. § 1003.14(a), but from Congress: It is the INA that explicitly and directly grants that authority." 930 F.3d at 360 (quotations omitted); *accord Perez-Sanchez*, 935 F.3d at 1155 ("The problem with treating 8 C.F.R. § 1003.14 as a jurisdictional rule is this: 'Congress alone controls [an agency's] jurisdiction.'" (quoting *Union Pac. R.R. Co.*, 558 U.S. at 71) (alteration in original)). And because "[t]hat statutory grant of authority is the immigration judges' 'subject matter jurisdiction,' and it

preexisted—by decades—§ 1003.14(a)'s reference to the vesting of 'jurisdiction' in immigration court," and because "nothing about that broad and mandatory grant of adjudicatory authority is made contingent on compliance with rules governing notices to appear, whether statutory or regulatory," the requirements under section 1003.14(a) cannot operate as "external constraints" on the immigration court's authority to conduct removal proceedings.  *Cortez*, 930 F.3d at 360 (quotations, citations, and alterations omitted); *see also Lopez-Munoz*, 941 F.3d at 1015 ("Given this congressional delegation of authority, the Attorney General could not unilaterally restrict immigration judges' jurisdiction."); *Perez-Sanchez*, 935 F.3d at 1155 ("[A]n agency cannot fashion a procedural rule to limit jurisdiction bestowed upon it by Congress.").

Furthermore, any deficiency in the initial Notice to Appear for lacking the address of the immigration court where the Notice would be filed was cured by the Form I-830, which indicated that the "[c]harging document will be filed with the [Office of the Immigration Judge] in Oakdale, LA."  Wheeler Declaration, Exh. H.  The Form I-830 clearly stated that a "[c]opy of this form has been given to [Defendant] for notification of jurisdiction/commencement of proceedings as required per CFR 3.14."  *Id.*  Defendant contends, however, that the Form I-830 "does not, within its four corners, clearly establish that it was ever served on [him]" since "it contains no certificate of service or information about how or when it was served."  Motion at 26 n.18.  Notably, Defendant does not assert that he was in fact not served with the Form I-830.  But even if he had not been served with that document, the July 2000 Notice of Hearing, which included the address of the immigration court, cured any deficiency.[4]  *See* Wheeler Declaration, Exh. I ("[A]ny motions

---

[4] Because the Court concludes that the requirements in section 1003.15(b) are "claim-processing" and do not implicate the immigration court's subject matter jurisdiction, the Court is not persuaded by the non-binding authorities cited by Defendant. *See* Motion at 27-28.  Moreover, as to the handful of district court decisions within the Ninth Circuit on which Defendant relies, those decisions were abrogated by the Ninth Circuit's decision in *Aguilar-Fermin v. Barr*, 958

. . . , applications, or other correspondence concerning this case should be filed with the Immigration Court at: 1900 E. Whatley Road, Oakdale, LA 71463.").

Accordingly, the Court holds that the requirement in 8 C.F.R. § 1003.15(b)(6) that a notice to appear include the address of the immigration court where the notice is to be filed sets forth a claim-processing rule that does not implicate the immigration court's subject matter jurisdiction. In this case, any deficiency in Defendant's Notice to Appear was cured by the Form I-830 and the Notice of Hearing.

### 3.  Section 1326(d) Requirements

Defendant's jurisdictional arguments fail for the additional reason that Defendant has not satisfied any of the requirements of 8 U.S.C. § 1326(d).  As an initial matter, Defendant argues, without citing to any authority, that he need not satisfy the requirements under section 1326(d) with respect to his jurisdictional arguments because his collateral challenge is directed at the immigration court's jurisdiction to order his removal.  *See* Motion at 39-40 (arguing that because Defendant's jurisdictional challenges are "of a different character than the kinds of due process violations that have typically given rise to collateral challenges under § 1326(d)," they are excused from section 1326(d)'s requirements).  According to Defendant, "because of the defective [Notice to Appear], here there simply *is* no removal order to collaterally attack: it is a nullity, 'not voidable, but simply void.'"  *Id.* at 40.  Defendant argues that section 1326(d)'s requirements are satisfied in any event because "[t]here are no administrative remedies to exhaust . . . when the agency lacks jurisdiction altogether, and moreover [Defendant], who was not informed that (as the court should well have known) the [Notice to Appear] was jurisdictionally defective, did not knowingly and intelligently waive an agency appeal."  *Id.*  The Court is unpersuaded.

---

F.3d 887 (9th Cir. 2020), as Defendant seems to acknowledge, *see* Motion at 28.

First, as discussed above, the IJ did act with proper authority in ordering Defendant's removal. But even if the IJ had lacked the authority to do so, "the practical wisdom behind § 1326's requirement[s] . . . , including with respect to challenges based on an asserted lack of jurisdiction . . . [,] 'is to ensure that the agency has an opportunity to correct its errors and develop a full evidentiary record.'" *Taveras*, 504 F. Supp. 3d at 288 (quoting *Zhong v. U.S. Dep't of Justice*, 480 F.3d 104, 125 (2d Cir. 2007)); *cf. Palomar-Santiago*, 141 S. Ct. at 1621 (rejecting the defendant's argument that "further administrative review of a removal order is not 'available' when an immigration judge erroneously informs a noncitizen that his prior conviction renders him removable" because "[a]dministrative review of removal orders exists precisely so noncitizens can challenge the substance of immigration judges' decisions"). As the Supreme Court recently made clear in *Palomar-Santiago*, "[t]he immigration judge's error on the merits does not excuse the noncitizen's failure to comply with a mandatory exhaustion requirement if further administrative review, and then judicial review if necessary, could fix that very error." *Id.*

Second, the text of section 1326(d) does not carve out an exception for jurisdictional challenges. *See Taveras*, 504 F. Supp. 3d at 286 (observing that section 1326(d) "does not contain any exception for jurisdictional challenges to removal orders"); *accord Palomar-Santiago*, 141 S. Ct. at 1622 (rejecting the defendant's argument that the section 1326(d) prerequisites do not apply where the removal order was "substantively invalid" because "such orders are invalid from the moment they are entered" and finding that the defendant's argument that "a prior removal order was substantively unlawful is a 'challenge' to that order"); *Cortez*, 930 F.3d at 358 ("[A] claim that the immigration court lacked jurisdiction over a certain group of noncitizens turns on a question of statutory interpretation, so that normal rules of exhaustion and forfeiture apply." (quotations and alterations omitted)). In fact, section 1326(a) makes clear that "an alien may not

challenge the validity of the deportation order" *unless* its requirements are met.   8 U.S.C. § 1326(d); *see also United States v. Garcia-Galvan*, 777 F. App'x 921, 924 (10th Cir. 2019) (rejecting the defendant's argument that he "is not required to meet 8 U.S.C. § 1326(d)'s collateral attack requirements because he is attacking the subject-matter jurisdiction of the immigration court" (quotations omitted)).

Third, as the Honorable John G. Koeltl aptly observed in *Taveras*, unlike a situation where a noncitizen's waiver of a right to an administrative appeal was not "knowing and intelligent" because he or she was not informed of an "established right" to apply for certain discretionary relief from removal, there is "no analogous 'established right to be informed of the possibility' that [a notice to appear] was deficient or that a post-hearing challenge to jurisdiction might be viable." 504 F. Supp. 3d at 288.   Nor does Defendant cite to any authority obligating an immigration judge to notify a noncitizen of that possibility.

\* \* \*

For these reasons, the Court will not dismiss the Information on the ground that the IJ lacked jurisdiction to order Defendant's removal.

## B.  Eligibility for Voluntary Departure

Having determined that the IJ had authority to order Defendant removed, the Court turns to Defendant's argument that the removal order was invalid because the IJ did not provide him an opportunity to apply for voluntary departure prior to entering the removal order.   The Attorney General has discretion to permit an eligible noncitizen "voluntarily to depart the United States at the [noncitizen's] expense . . . , in lieu of being subject to proceedings under section 1229a of this title [*i.e.*, removal proceedings] or prior to the completion of such proceedings."   8 U.S.C. § 1229c(a)(1).   As relevant here, those ineligible for voluntary departure include noncitizens

convicted of an aggravated felony, *see id.*; *id.* § 1227(a)(2)(A)(iii), which includes "illicit trafficking in a controlled substance (as defined in section 802 of Title 21)," *id.* § 1101(a)(43)(C).

### 1. Fundamental Unfairness

The Court begins with the third requirement of section 1326(d), fundamental unfairness, which will inform the Court's analysis with respect to the first two requirements. Defendant argues that the removal hearing was fundamentally unfair because the IJ's failure to inform him of his eligibility for voluntary departure denied him the opportunity to apply for such relief. In order to establish fundamental unfairness, a defendant "must show both a fundamental procedural error and prejudice resulting from that error." *Fernandez-Antonia*, 278 F.3d at 159. "Prejudice is shown where defects in the deportation proceedings may well have resulted in a deportation that would not otherwise have occurred." *Copeland*, 376 F.3d at 73 (quotations omitted). "The alien bears the burden of showing that entry of the removal order was fundamentally unfair." *United States v. Daley*, 702 F.3d 96, 100 (2d Cir. 2012).

### a. Fundamental Procedural Error

The Court first considers whether an immigration judge's failure to inform a noncitizen of his or her right to apply for voluntary departure can constitute a fundamental procedural error, and then considers whether the IJ at Defendant's removal proceedings committed such an error. While the Second Circuit has not yet decided the first question, it has held that an immigration judge's failure to inform an eligible noncitizen about the possibility of another type of discretionary relief, specifically, a waiver of deportation under former section 212(c) of the INA, 8 U.S.C. § 1182(c) (repealed 1996), can constitute a fundamental procedural error. *See United States v. Calderon*, 391 F.3d 370, 376 (2d Cir. 2004) (holding that an immigration judge's failure to advise a

noncitizen of the right to seek section 212(c) relief can constitute fundamental procedural error); *Copeland*, 376 F.3d at 71 ("[A] failure to advise a potential deportee of a right to seek Section 212(c) relief can, if prejudicial, be fundamentally unfair within the meaning of Section 1326(d)(3).").

In *Copeland*, the defendant, who was charged with illegal reentry, challenged the validity of his underlying deportation on the basis that the immigration judge who presided over his removal proceedings incorrectly advised him that he was not eligible to seek relief under section 212(c).  Prior to 1996, section 212(c) gave the Attorney General "broad discretion to cancel deportation orders for aliens who met certain residence requirements and had not served five years in prison for an aggravated felony." *Id.* at 64.  In 1996, Congress enacted two laws: one that made noncitizens convicted of aggravated felonies ineligible for section 212(c) relief, regardless of how much time they served; and another that authorized the Attorney General to cancel removal for a narrow class of noncitizens not convicted of an aggravated felony. *Id.* (citations omitted).  At the time of the removal proceedings for the defendant in *Copeland*, the BIA's position was that these new laws applied to noncitizens, like that defendant, who had pleaded guilty to aggravated felonies before the new laws were enacted. *Id.*  In accordance with this position, the immigration judge advised the defendant that he was not eligible to seek section 212(c) relief. *Id.*  After the defendant's deportation, however, the Supreme Court held in *INS v. St. Cyr*, 533 U.S. 289 (2001), that the 1996 amendments could not be applied retroactively to deny section 212(c) relief to a noncitizen who had pleaded guilty prior to 1996.  *Copeland*, 376 F.3d at 65 (citing *St. Cyr*, 533 U.S. at 326).   The defendant reentered the country soon after he was deported and was subsequently arrested and charged with illegal reentry. *Id.*

The district court in *Copeland* dismissed the indictment, holding that the defendant's underlying deportation order violated his due process rights because the immigration judge incorrectly advised him that no relief was available under section 212(c). *Id.* The Second Circuit affirmed, diverging from the majority of the Circuits to hold that the failure to inform a noncitizen of his or her right to seek discretionary relief under section 212(c) can constitute a fundamental procedural error. *Id.* at 70-71; *accord United States v. Sosa*, 387 F.3d 131, 138 (2d Cir. 2004) (holding that the immigration judge "committed error 'of a fundamental nature'" by failing to inform the defendant of his right to seek section 212(c) relief). "Critical" to the Second Circuit's reasoning in *Copeland* was "the distinction between a right to seek relief and the right to that relief itself": "[t]he decisions holding that a failure to inform an alien about Section 212(c) relief cannot be a fundamental error collapse this distinction and incorrectly assume that, because the grant of Section 212(c) relief is itself discretionary, the denial of a Section 212(c) hearing cannot be a fundamental procedural error." *Copeland*, 376 F.3d at 72. In other words, the Second Circuit recognized that the right to be informed of the possibility of discretionary relief is separate and apart from any entitlement to the relief itself, and the denial of such right to be informed may constitute a fundamental procedural error. *Id.* ("[T]he right to a Section 212(c) hearing is well established and mandatory, whether or not the ultimate relief is discretionary."). Further informing the Second Circuit's analysis was the fact that an immigration judge, unlike an Article III judge, "is not merely the fact finder and adjudicator but also has an obligation to establish the record" and "a ruling by an IJ that misleads an alien into believing that no relief exists falls into a different category because of the special duties of an IJ to aliens." *Id.* at 71.

Following the Second Circuit's reasoning in *Copeland* and other section 212(c) cases, district courts in this Circuit have held that an immigration judge's failure to advise an eligible

noncitizen of the right to seek voluntary departure likewise constitutes a fundamental procedural error.  *See, e.g.*, *United States v. Brown*, 354 F. Supp. 3d 362, 369-70 (S.D.N.Y. 2018) ("This Court . . . joins other courts in this Circuit in concluding that a failure to advise the right to seek relief through voluntary departure is a fundamental error."); *United States v. Guzman*, No. 18 Cr. 216 (GHW), 2018 WL 3443158, at *4 (S.D.N.Y. July 17, 2018) ("The immigration judge's failure to inform [the defendant] of the availability of voluntary departure was a fundamental procedural error."); *United States v. Gonzalez*, No. 15 Cr. 21 (JMF), 2015 WL 3443942, at *1 (S.D.N.Y. May 29, 2015) ("[T]he Court follows the only courts within the Circuit to have decided the question and holds that the failure to inform an alien about the right to seek voluntary departure does indeed qualify as fundamental error if the alien shows that he was prejudiced by the error.").  Indeed, both Defendant and the Government agree that the Second Circuit's reasoning in the section 212(c) cases applies to voluntary departure relief.  *See* Dkt. 54 at 1 (the Government acknowledging that, assuming that the Second Circuit's decisions in the section 212(c) context survive *Palomar-Santiago*, "the Second Circuit's analysis in those cases would also seem to apply in the context of voluntary departure"); Dkt. 55 at 1 (Defendant noting that "district courts in this Circuit have uniformly held that the Second Circuit's caselaw regarding . . . § 212(c) relief applies to . . . voluntary departure" and "[s]o far as undersigned counsel is aware, no district court in this Circuit has ruled otherwise").

The Court agrees and concludes that an immigration judge's failure to inform an eligible noncitizen of the availability of voluntary departure can constitute a fundamental procedural error under the Second Circuit's analysis in *Copeland* and its progeny.  Comparing the relief afforded under section 212(c) and voluntary departure, the Court finds no meaningful difference.  Just as with section 212(c) relief, at the time of Defendant's removal proceedings, the decision to grant

voluntary departure was conferred by a federal statute implemented by federal regulations. *See* 8 U.S.C. § 1229c; 8 C.F.R. § 240.26 (now 8 C.F.R. § 1240.26).  And as with section 212(c) relief, the relevant regulation provided that the immigration judge had a duty to inform a noncitizen of potential forms of relief to which he or she is eligible, including voluntary departure.  8 C.F.R. § 240.11 (a)(2) (now 8 C.F.R. § 1240.11(a)(2)) ("The immigration judge shall inform the alien of his or her apparent eligibility to apply for any of the benefits enumerated in this chapter and shall afford the alien an opportunity to make application during the hearing."); *accord In re Cordova*, 22 I. & N. Dec. 966, 970 (B.I.A. 1999) (citing 8 C.F.R. § 240.11(a)(2)).  Therefore, even though the right to voluntary departure, itself, is discretionary, the right of an eligible noncitizen to be informed of the possibility of voluntary departure relief is an "established right" under the logic of the Second Circuit decisions in the section 212(c) context.

And while voluntary departure differs from section 212(c) relief in that voluntary departure does not permit a noncitizen to remain in the United States, it does confer a host of benefits, including avoiding "extended detention pending completion of travel arrangements," *Dada v. Mukasey*, 554 U.S. 1, 11 (2008), and "avoiding the penalties attendant to deportation, which include five-or ten-year bars on seeking readmission to the country," *Yong Kang Huang v. Holder*, 359 F. App'x 188, 189 (2d Cir. 2009) (summary order).  Most significantly, for purposes of Defendant's instant prosecution, voluntary departure precludes a future prosecution for illegal reentry since a prior removal order is a necessary element of an offense under 8 U.S.C. § 1326(a). *See Brown*, 354 F. Supp. 3d at 368 ("Because a prior deportation order is an element of the crime, a noncitizen who was granted voluntary departure, rather than deported or removed, cannot be prosecuted for illegal reentry." (citing 8 U.S.C. § 1326(a)(1))).  Said differently, had the IJ granted

Defendant voluntary departure rather than ordered him removed, the Government would not be able to satisfy one of the elements of the charged illegal reentry offense.

Against the backdrop that an immigration judge's failure to advise an eligible noncitizen about the right to seek voluntary departure can constitute a fundamental procedural error, the Court turns to whether the IJ's failure to do so at Defendant's proceedings was such an error.  As previously stated, "[a]n Immigration Judge has a duty to inform aliens of potential forms of relief for which they are *apparently eligible, including voluntary departure*."  *In re Cordova*, 22 I. & N. Dec. at 970-71 (emphasis added); *see United States v. Nunez*, 375 F. Supp. 3d 232, 244 (E.D.N.Y. 2018) ("An IJ is required to inform eligible aliens about the availability of discretionary relief, including voluntary departure.").  As relevant here, a noncitizen is "eligible" for voluntary departure "if there is no evidence in the record that the alien has been convicted of an aggravated felony under section 101(a)(43)."  *In re Cordova*, 22 I. & N. Dec. at 970; *see also Chavarria-Reyes v. Lynch*, 845 F.3d 275, 278 (7th Cir. 2016) ("*In re Cordova* . . . concluded that an IJ must raise the subject of voluntary departure at an early procedural hearing . . . unless the alien has been convicted of an aggravated felony."); *In re R-S-H*, 23 I. & N. Dec. 629, 633 (B.I.A. 2002) ("[I]f the evidence of record does not indicate that an alien has been convicted of an aggravated felony or other applicable crime, the Immigration Judge has the duty to provide him or her with information about voluntary departure . . . before the pleadings are taken.").

Section 101(a)(43)(B) of the INA defines[5] "aggravated felony" to include, among other offenses, "illicit trafficking in a controlled substance (as defined in section 802 of title 21)."  8

---

[5] The Court uses the present tense to describe the provisions governing the federal and New York definitions of cocaine because those provisions are the same today as they were at the time of Defendant's New York Conviction and his removal proceedings.  Unless otherwise noted, the citations to those provisions also have not changed.

U.S.C. § 1101(a)(43)(B).   Section 802 defines a "controlled substance" as "a drug or other substance, or immediate precursor, included in schedule I, II, III, IV, or V of part B of this subchapter." 21 U.S.C. § 802(6).  Thus, the question is whether Defendant's New York Conviction qualifies as an "aggravated felony" and, more specifically, whether the New York statute of Defendant's conviction entails the illegal trafficking of a controlled substance as defined in 21 U.S.C. § 802.[6]   *See Mellouli v. Lynch*, 575 U.S. 798, 813 (2015) (holding that "to trigger removal under § 1227(a)(2)(B)(i), the Government must connect an element of the alien's conviction to a drug 'defined in [§ 802]'" because the text of the statute "limits the meaning of 'controlled substance' . . . to the substances controlled under § 802"); *Moncrieffe v. Holder*, 569 U.S. 184, 192 (2013) (observing that "a state drug offense . . . must 'necessarily' proscribe conduct that is an offense under the [Controlled Substances Act]" in order to constitute an "aggravated felony").

In assessing whether a state conviction qualifies as an "aggravated felony" under the INA, courts employ a "categorical approach" to determine "whether the state offense is comparable to an offense listed in the INA."  *Moncrieffe*, 569 U.S. at 190; *see Mellouli*, 575 U.S. at 806 ("The categorical approach has been applied routinely to assess whether a state drug conviction triggers removal under the immigration statute.").   Under the categorical approach, courts identify "the minimum criminal conduct necessary for conviction under a particular statute by looking only to

---

[6] The Second Circuit in *Pascual v. Holder*, 707 F.3d 403 (2d Cir. 2013), held that the defendant's prior New York state conviction for criminal sale of a controlled substance in the third degree, specifically cocaine, in violation of New York Penal Law section 220.39(1) (*i.e.*, the same New York criminal statute at issue in this case) constitutes an aggravated felony conviction.  The *Pascual* Court, however, neither addressed nor resolved the cocaine isomer issue that is the subject of Defendant's motion to dismiss.  *See id.* at 405 (rejecting the defendant's argument that a conviction under "NYPL § 220.39 is not categorically an aggravated felony because statutes that punish 'offers to sell,' *see* NYPL § 220.00(1), are not drug trafficking crimes under the [Controlled Substances Act]").  Accordingly, the Second Circuit in *Pascual* did not decide the question presented here.

the statutory definitions—i.e., the elements—of the offense, and not to the particular underlying facts." *Hylton v. Sessions*, 897 F.3d 57, 60 (2d Cir. 2018) (quotations omitted).  In other words, "[i]f the state statute criminalizes conduct that the federal offense does not, the two are *not* categorical matches and a conviction under the state statute cannot serve as a predicate for removal under the INA." *Williams v. Barr*, 960 F.3d 68, 72 (2d Cir. 2020) (emphasis added).

Here, Defendant was convicted of attempted criminal sale of a controlled substance in violation of New York Penal Law sections 110[7] and 220.39.  Wheeler Declaration, Exh. B.  Section 220.39 provides, in relevant part, that "[a] person is guilty of criminal sale of a controlled substance in the third degree when he knowingly and unlawfully sells . . . a narcotic drug."  N.Y. Penal Law § 220.39(1).  A "narcotic drug" is defined as "any controlled substance listed in schedule I(b), I(c), II(b) or II(c) other than methadone."  N.Y. Penal Law § 220.00(7).  Schedule II(b) of the New York statute, in turn, defines "cocaine" and related substances as:

> Coca leaves and any salt, compound, derivative, or preparation of coca leaves, and any salt, compound, derivative, or preparation thereof which is chemically equivalent or identical with any of these substances including cocaine and ecgonine, their salts, isomers, and salts of isomers, except that the substances shall not include decocainized coca leaves or extraction of coca leaves, which extractions do not contain cocaine or ecgonine.

N.Y. Pub. Health Law § 3306, Schedule II(b)(4).

In comparison, Schedule II of the federal Controlled Substances Act defines "cocaine" as:

> Coca leaves . . . and any salt, compound, derivative or preparation of coca leaves (including cocaine . . . and ecgonine . . . and their salts, isomers, derivatives and salts of isomers and derivatives), and any salt, compound, derivative, or preparation

---

[7] Section 110 is the general attempt statute, which provides that "[a] person is guilty of an attempt to commit a crime when, with intent to commit a crime, he engages in conduct which tends to effect the commission of such crime."  N.Y. Penal Law § 110.

>thereof which is chemically equivalent or identical with any of these substances,
>except that the substances shall not include decocainized coca leaves or extraction
>of coca leaves, which extractions do not contain cocaine or ecgonine.

21 C.F.R. § 1308.12(b)(4).  And the term "isomer," as used in section 1308.12(b)(4), "means the optical or geometric isomer."  21 C.F.R. § 1300.01(b)(21) (2000) (now 21 C.F.R. § 1300.01(b)).  Isomers are "[c]hemical compounds that have the same composition but differ in the chemical arrangement of their constituents."  *Merck Eprova AG v. Gnosis S.p.A*, 760 F.3d 247, 252 (2d Cir. 2014).  There are various types of isomers; the federal definition, however, extends only to "optical or geometric" isomers of cocaine.  The New York definition, in contrast, does not limit the type of isomers that fall within its definition of cocaine.  Rather, by its terms, New York's definition of cocaine covers isomers of cocaine other than optical and geometric, including positional isomers and other isomers.  *See, e.g.*, *United States v. Fernandez-Taveras*, 511 F. Supp. 3d 367, 373 (E.D.N.Y. 2021) (citing *United States v. Phifer*, 909 F.3d 372, 376 (11th Cir. 2018)).

This conclusion is buttressed by the scope of the federal definition of "isomer" with regard to other drugs.  The full definition of "isomer" in the federal regulations reads:

>The term isomer means the optical isomer, except as used in § 1308.11(d) and
>§ 1308.12(b)(4) of this chapter.  As used in § 1308.11(d) of this chapter, the term
>isomer means the optical, positional, or geometric isomer.   As used in
>§ 1308.12(b)(4) of this chapter, the term isomer means the optical or geometric
>isomer.

21 C.F.R. § 1300.01(b)(21) (now 21 C.F.R. § 1300.01(b)).  Thus, the word "isomer" as used in the federal drug regulations generally refers only to "optical" isomers, except when used in the definition of cocaine, which is at section 1308.12(b)(4), or when used in the definition of hallucinogens, which is at section 1308.11(d).  For cocaine, isomers includes "optical or geometric" isomers[8]; for hallucinogens, isomers includes "optical, positional, or geometric"

---

[8] This expanded definition to additionally reach "geometric" isomers of cocaine may have been a response to a concern about the rise of the so-called "isomer defense" in federal criminal

isomers.  The federal cocaine definition could have included "positional" (or other) isomers, but it did not.  Courts "generally avoid interpreting a regulation in a way that renders one of its provisions meaningless," or in isolation without reference to the regulatory context.  *Alhovsky v. N.Y. City Dep't of Parks and Rec.*, No. 11 Civ. 3669 (NRB), 2012 WL 3552916, at *2 (S.D.N.Y. Aug. 16, 2012)*; cf. Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." (quotations omitted)).  Viewed in context, section 1300.01(b)(21) reflects a limitation of cocaine isomers to cover only "optical and geometric" isomers and not others.  *See Fernandez-Taveras*, 511 F. Supp. 3d at 373 ("[T]he federal scheme excludes positional isomers from its definition of cocaine but includes them in its definition of hallucinogens.").

This plain textual reading of the relevant federal regulations compels the conclusion that New York's definition of cocaine, without limitation to particular types of isomers, is categorically broader than the federal definition.  As such, the New York statute criminalizes conduct— specifically conduct involving cocaine isomers other than optical or geometric isomers—that the federal statute does not.  Other district courts in this Circuit have reached the same conclusion. *See id.* at 374 (concluding that "the New York statute applies on its face to cocaine isomers to which the [Controlled Substances Act] does not"); *United States v. Baez-Medina*, No. 20 Cr. 24 (JGK), Dkt. 50 (July 1, 2021 Tr.) ("*Baez-Medina* Tr.") (Wheeler Declaration, Exh. O) at 9 (finding that the defendant's New York conviction cannot be considered a controlled substances offense

---

prosecutions, which is discussed shortly.  *See* S. Rep. 98-225, at 263, 1984 U.S.C.C.A.N. 3183, 3445 (1983) ("Because of the absence of a clear definition of what is meant by the term 'isomer,' clandestine manufacturers have attempted to circumvent the law by manufacturing . . . optical and geometric isomers of cocaine.").

because "[t]he New York state statute controls cocaine and all isomers of cocaine while the federal statute controls only the optical and geometric isomers of cocaine"); *United States v. Ferrer*, No. 20 Cr. 650 (NRB), Dkt. 25 (July 21, 2021 Tr.) ("*Ferrer* Tr.") (Wheeler Declaration, Exh. P) at 46 (reaching same conclusion).

The Government's arguments to the contrary are unavailing.  The Government argues that the New York statute does not criminalize conduct covered by the federal statute because the New York statute does not*, on its face*, include isomers of cocaine other than optical and geometric isomers.  According to the Government, the federal definition "includes cocaine and its optical and geometric isomers to the extent that they are a subset of 'any salt, compound, derivative or preparation of coca leaves,'" whereas New York's definition "includes cocaine and its isomers to the extent that they are a subset of 'any salt, compound, derivative, or preparation thereof *which is chemically equivalent or identical with* any of these substances.'"  Opposition at 18.  The Government maintains that this distinction matters because it means that New York's definition "does *not* include all isomers of cocaine—as broadly defined—but rather only those that are 'chemically equivalent or identical with' coca leaves or 'any salt, compound, derivative, or preparation of coca leaves.'"  *Id.* (emphasis in original).  The Court is not persuaded.  As Judge Koeltl observed in *Baez-Medina*, "the government's textual argument misreads the New York statute.  The New York statute under a plain reading suggests that 'cocaine and ecgonine, their salt, isomers and salt isomers' can be chemically equivalent to 'coca leaves' or any 'salt, compound, derivative or preparations thereof' and are controlled by New York state law." *Baez-Medina* Tr. at 9.  In other words, "'isomers' are specifically included in the subset of molecules that can be chemically equivalent or identical with coca leaves or any salt, compound, derivative or preparation thereof." *Id.*; *see* N.Y. Pub. Health Law § 3306, Schedule II(b)(4) (including in the

definition of cocaine "[c]oca leaves and any salt, compound, derivative, or preparation of coca leaves, and any salt, compound, derivative, or preparation thereof which is chemically equivalent or identical with any of these substances *including* . . . isomers" (emphasis added)).

The Court also is not persuaded by the Government's argument that the New York legislature, despite the plain text of the statute, could not have intended to include *all isomers*, including positional isomers.  The Government claims that both the New York and federal statutes were amended in response to the "isomer defense," which concerned only l-cocaine and d-cocaine, and the courts at the time understood there to be only eight isomers of cocaine: "natural cocaine (or 'l-cocaine'), the optical isomer of cocaine (or 'd-cocaine'), and six other stereoisomers of cocaine understood to be geometric isomers."  Opposition at 19-22.  According to the Government, construing the New York statute to include all isomers would lead to an "absurd result" because it would reach "hundreds of thousands, if not millions, of substances," including a commonly prescribed anti-nausea medication.  Opposition at 23-24; Dkt. 42 at 14-16.  The Government therefore seems to suggest that the absurdity doctrine compels its preferred reading of the New York statute.  That doctrine, however, should be employed only in the rarest of cases, especially when the statutory language is clear.  "In the ordinary case, absent any indication that doing so would frustrate [the legislature]'s clear intention or yield patent absurdity, [a court's] obligation is to apply the statute as [the legislature] wrote it."  *Hubbard v. United States*, 514 U.S. 695, 703 (1995) (quotations and citation omitted); *see Clinton v. City of New York*, 524 U.S. 417, 429 (1998) (applying the absurdity doctrine where there was "no plausible reason" for the Government's statutory reading, which "would produce an absurd and unjust result which Congress could not have intended" (quoting *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 574 (1982)).

Far from producing an absurd outcome that lacks any "plausible reason," it appears that the New York legislature intended to have its law reach all cocaine isomers.  When the New York legislature amended the definition of cocaine under Schedule II in 1978, it was concerned about the increasing number of challenges brought in federal prosecutions over whether certain isomers of cocaine constituted controlled substances so as to support a criminal conviction under the federal statute.  Wheeler Declaration, Exh. M (Sponsor's Memorandum, Bill Jacket, L. 1978, ch. 100) at 6.  Specifically, the New York legislature was concerned with the difficulty in distinguishing between a "levo isomer," which "occurs naturally in coca leaves and can be chemically synthesized so this isomer is clearly within Schedule II(a)(4)," and a "dextro isomer," which "is the mirror image of the levo isomer" but "is not chemically identical" and thus has created "debate among chemists as to whether or not it is a controlled substance."  *Id.*  The legislature worried that, should courts decide that a dextro isomer of cocaine is not a controlled substance, criminal prosecutions could face several obstacles, including requiring expensive laboratory testing to differentiate between different isomers of cocaine and potentially "[e]xposing the public to the risks entailed by a legalized form of cocaine" (*i.e.*, a dextro isomer), which, the sponsors of the legislation noted, "appears to be contrary to the legislative intent of Section 3306 of the Public Health Law."  *Id.*  To address the "problems" caused by this "isomer defense" and to close "the statutory loophole," the New York legislature amended the definition of cocaine to "include *all isomers* of cocaine and ecgonine in the schedule of controlled substances."  *Id.* (emphasis added).

Thus, while it may be the case that the legislature was primarily concerned with dextro isomers of cocaine, it nonetheless deliberately chose to address the "problems" and "the statutory loophole" by amending New York's definition to reach all isomers of cocaine.  In other words,

while New York *could have* chosen to define isomers of cocaine to include only optical and geometric isomers, like the federal definition, it simply chose not to.  *See Baez-Medina* Tr. at 10 (finding that the legislative history makes "clear that the chosen solution of the New York State Legislature to deal with the dextro isomer offense was to prohibit all isomers or to control all isomers of cocaine").  And again, most importantly, this outcome is compelled by the plain text of Schedule II(b) of New York's law, which makes clear that the state's definition of cocaine includes all isomers of cocaine.  *See id.* ("Whether wise or not or overbroad or not, the provisions of the New York state law should be understood as drafted until amended."); *Ferrer* Tr. at 46 ("Nonetheless, the term is 'all isomers,' and I cannot rewrite the statute."); *United States v. Minter*, No. 20 Cr. 389 (JGK) (Sentencing Tr. Oct. 12, 2021), Dkt. 72 (Wheeler Declaration, Exh. Q) at 21-22 (observing that the Government's argument that "the New York State Legislature could not have intended what the New York State Legislature said" is "an argument that ought to be made to the New York State Legislature" and not to the judge "reading what the New York State Legislature did, and then what the New York State Legislature said in the jacket to the amendment to the statute").

Finally, the Government argues that "there was nothing fundamentally unfair about the defendant's removal proceedings because the IJ applied prevailing law at the time in finding that the defendant was not eligible for discretionary relief."  Opposition at 27.  But this argument presupposes that courts at the time of Defendant's removal specifically analyzed this issue and concluded that New York's definition of cocaine was a categorical match to the federal definition. The Court is not aware of any court that did so, and the Government points to none in its papers. In any event, the Government's argument is foreclosed by the Second Circuit's decisions in the section 212(c) context, which also involved immigration judges applying then-current BIA

guidance regarding eligibility for section 212(c) relief before it was overruled by the Supreme

Court in *St. Cyr*. The Second Circuit nonetheless held in those cases that "a failure to advise a

potential deportee of a right to seek Section 212(c) relief can . . . be fundamentally unfair within

the meaning of Section 1326(d)(3)." *Copeland*, 376 F.3d at 71; *see also Sosa*, 387 F.3d at 138

(same); *Calderon*, 391 F.3d at 376 (same).[9]

Because the Court finds that New York's definition of cocaine, on its face, is broader than

the federal definition, it does not address the Government's arguments under the realistic

probability test. *See Williams*, 960 F.3d at 78 (finding that the "realistic probability" test "has no

role to play in the categorical analysis . . . when the state statute of conviction on its face reaches

beyond the generic federal definition"); *Hylton*, 897 F.3d at 63 ("The realistic probability test is

obviated by the wording of the state statute, which on its face extends to conduct beyond the

definition of the corresponding federal offense.").

### b. Prejudice

The Court next considers whether the IJ's failure to advise Defendant of his eligibility for

voluntary departure was prejudicial. To show prejudice, Defendant must demonstrate a reasonable

probability that, but for the IJ's failure to advise him of the availability of applying for voluntary

departure, he would have sought voluntary departure and would have been granted such relief. *See*

*Fernandez-Antonia*, 278 F.3d at 159 (prejudice results when "defects in the deportation

proceedings may well have resulted in a deportation that would not otherwise have occurred"

---

[9] Given the Second Circuit's divergence from the majority of the Circuits in holding that the failure to inform a noncitizen of his right to seek section 212(c) relief can constitute a fundamental procedural error, the out-of-Circuit decisions on which the Government relies are inapposite. *See United States v. Delcarmen-Abarca*, 846 F. App'x 477 (9th Cir. 2021); *United States v. Lopez-Callazo*, 824 F.3d 453 (4th Cir. 2016); *United States v. Vidal-Mendoza*, 705 F.3d 1012 (9th Cir. 2013).

(quotations omitted)); *Daley*, 702 F.3d at 100 ("[P]rejudice is shown where 'there is a reasonable probability that, but for [the error], the result of the proceeding would have been different.'" (alterations in original) (quoting *Copeland*, 376 F.3d at 73)).  The Second Circuit has defined a "reasonable probability" as a "probability sufficient to undermine confidence in the outcome." *United States v. Lopez*, 445 F.3d 90, 100 (2d Cir. 2006) (quotations omitted).  Courts in this District have quantified a reasonable probability as "a twenty percent probability that relief would have been granted absent the error." *Brown*, 354 F. Supp. 3d at 371 (citing *United States v. Copeland*, 369 F. Supp. 2d 275, 288 (E.D.N.Y. 2005)).  In determining whether there is a "reasonable probability" that Defendant would have obtained relief had he been informed of, and sought, voluntary departure, the Court "must first obtain all of the facts relevant to" Defendant and then apply the applicable standards to those facts, "taking into account actual cases in which similarly situated aliens have been granted or denied discretionary relief." *Copeland*, 376 F.3d at 74.

A noncitizen may apply for voluntary departure in lieu of removal either before the conclusion of removal proceedings or at the conclusion of the proceedings.  *In re Arguelles-Campos*, 22 I. & N. Dec. 811, 813 (B.I.A. 1999) (citing 8 U.S.C. § 1229c).  Where a noncitizen applies for voluntary departure before the conclusion of removal proceedings, the noncitizen must concede removability, must waive appeal of all issues, must not have been convicted of an aggravated felony, and may not request any additional relief.  *See* 8 C.F.R. § 1240.26(b)(1)(i)(B), (C), (D), (E).  To be granted voluntary departure prior to the conclusion of removal proceedings, a noncitizen "need not show that he has good moral character or that he has the financial means to depart the United States."[10]  *Arguelles-Campos*, 22 I. & N. Dec. at 817.  An immigration judge

---

[10] An immigration judge has "broader" discretionary authority to grant voluntary departure before the conclusion of removal proceedings, compared to at the conclusion of removal proceedings.  An alien who seeks voluntary departure at the conclusion of proceedings must show,

has "broad discretion" to grant or deny voluntary departure.  *Patino v. Holder*, 520 F. App'x 18,

20 (2d Cir. 2013) (summary order) (citing *Arguelles-Campos*, 22 I. & N. Dec. at 819).   In

considering whether to grant voluntary departure, an immigration judge may weigh "many

factors," including "the nature and underlying circumstances of the deportation ground at issue;

additional violations of the immigration laws; the existence, seriousness, and recency of any

criminal record; and other evidence of bad character or the undesirability of the applicant."[11]

*Arguelles-Campos*, 22 I. & N. Dec. at 817.   The BIA has held that "discretion may be favorably

exercised in the face of adverse factors where there are compensating elements such as long

residence here, close family ties in the United States, or humanitarian needs."  *Id.*

Defendant maintains that, had he been advised of his eligibility for voluntary departure, he

would have applied for such relief.  Gutierrez-Campos Declaration ¶ 8 ("If I had known at the time

that I could leave voluntarily and that it would be easier to come back legally that way, I would

have asked for this option because I wanted to be in the United States in the future with [his then-

girlfriend], working to support my family.");  *see also* Dkt. 55-1 (when asked by the IJ during his

---

among other things, that "the alien is, and has been, a person of good moral character for at least 5 years immediately preceding the alien's application for voluntary departure" and that "the alien has established by clear and convincing evidence that the alien has the means to depart the United States and intends to do so."  8 U.S.C. § 1229c(b)(1); 8 C.F.R. § 1240.26(c)(1)(ii), (iv).  Such requirements do not apply where the alien seeks voluntary departure before the conclusion of removal proceedings.  *See* 8 C.F.R. § 1240.26(b).

[11] The Second Circuit in *Copeland* engaged in a similar balancing test in assessing whether there was a reasonable probability that the defendant would have been granted section 212(c) relief, weighing adverse factors, including "the nature and circumstances of the exclusion ground at issue, the presence of additional immigration law violations, the existence of a criminal record and its nature, recency and seriousness, and the presence of other evidence indicative of an alien's bad character or undesirability as a permanent resident," against favorable considerations, including "family ties within this country, residence of long duration in this country, arrival in the country at a young age, evidence of hardship to the alien and the alien's family upon deportation, Armed Forces service, employment history, community service, property or business ties, [and] evidence attesting to good character."  376 F.3d at 74.

removal hearing what he "wish[ed] to do," Defendant responding that he "wish[ed] to sign the papers to leave the country").  Based on Defendant's representation to the Court in his declaration, made "under penalty of perjury," Defendant has demonstrated a reasonable probability that he would have sought voluntary departure.[12]

Next, Defendant must demonstrate a reasonable probability that, had he sought voluntary departure, he would have been granted that relief.  To do so, the Court must determine whether there is a reasonable probability that Defendant would have met the statutory eligibility requirements and a favorable exercise of discretion would have been warranted.  Here, Defendant contends that he would have made his application for voluntary departure during the initial removal hearing on July 18, 2000 and, therefore, would have had to meet only the more lenient pre-hearing statutory eligibility requirements.  The Court concludes that it is reasonably likely that Defendant would have been statutorily eligible for voluntary departure because, as discussed, the New York Conviction was not a disqualifying aggravated felony and, as demonstrated by the recording and translation of Defendant's removal hearing, Defendant conceded removability, waived appeal, and did not request any other relief.  *See* Wheeler Declaration, Exh. K; Dkt. 55-1.

The Court also finds that there is a reasonable probability that the IJ would have granted Defendant voluntary departure.  Despite his criminal conviction for attempted sale of cocaine in New York, Defendant points to various positive factors, including having resided in the United States for approximately fifteen years and having strong ties to his then-girlfriend who was

---

[12] During oral argument, the Government faulted Defendant for failing to provide any "contemporaneous evidence" to corroborate his claim that he would have sought voluntary departure and argued that "the only evidence the Court has . . . is a self-serving, backward-looking declaration submitted in connection with a motion to dismiss this information."  Nov. 4, 2021 Tr. at 33.  But given that Defendant was not told that voluntary departure was even an option, it is hard to imagine what sort of contemporaneous evidence Defendant can realistically be expected to point to.

lawfully residing in the United States.  Motion at 20.  While the Government disagrees that these considerations support a "reasonable probability" that Defendant would have been granted voluntary departure, Opposition at 29, they likely would have worked in Defendant's favor. Defendant further contends that "his sole violation of immigration law was his unlawful entry as a young child brought by a relative," Motion at 20, and the Government has not contended otherwise.  This, too, likely would have counseled in favor of granting voluntary departure.  The Government counters, however, that Defendant's conviction for attempted sale of cocaine, his lack of family ties to the United States at the time of his removal, and his absconding after pleading guilty in New York County Supreme Court and eventually being sentenced to a year in prison for the New York Conviction "differentiate the defendant's case from those cited in the defendant's Motion."  Opposition at 29.

While a close call, the Court finds that Defendant has demonstrated a reasonable probability that he would have received voluntary departure.  Defendant identifies in his Motion a handful of cases which seem to present similar or more egregious circumstances than here, yet an immigration judge granted voluntary departure.  *See, e.g.*, *In re Jimenez*, 2011 WL 6706349, at *1 (B.I.A. Nov. 19, 2011) (granting voluntary departure for noncitizen with "extensive criminal history including convictions for burglary, driving under the influence, and a conviction in 2010 for possession of a controlled substance"); *In re: Chia I Lui Dix*, 2011 WL 1373693, at *2 (B.I.A. Mar. 23, 2011) (granting voluntary departure for a noncitizen convicted of possession of heroin); *see also Brown*, 354 F. Supp. 3d at 373 (finding that there was a reasonable probability that the defendant would have been granted voluntary departure because, despite the defendant's marijuana convictions, he had resided in the United States for over fifteen years, has children who are U.S. citizens, and had not previously violated any immigration laws apart from his initial entry

into the United States).  Moreover, as noted, in demonstrating prejudice, Defendant's burden is not to show that he would have in fact been granted voluntary departure.  *Id.* ("A reasonable probability does not require that it is 'more likely than not' that the IJ would have exercised his discretion to grant Defendant voluntary departure.").  The "reasonable probability" standard is considerably lower, and considers whether the showing is "sufficient to undermine confidence in the outcome."  *Lopez*, 445 F.3d at 100.  And in fact, as noted, courts in this District have quantified a reasonable probability as "a twenty percent probability that relief would have been granted absent the error."  *Brown*, 354 F. Supp. 3d at 371.  The Court thus finds that Defendant has established a reasonable probability that he would have been granted voluntary departure.  *See Gonzalez*, 2015 WL 3443942, at *11 (finding that the defendant showed a "reasonable probability" that he would have obtained voluntary departure because, even though "the Government point[ed] to cases upholding an immigration judge's denial of voluntary departure on the basis of prior drug convictions," the defendant identified "many other cases coming out the other way").

### 2. Administrative Exhaustion

Turning to the administrative exhaustion requirement of section 1326(d)(1), the parties agree that Defendant has not exhausted his administrative remedies.  Defendant nonetheless urges the Court to excuse that failure to exhaust because his waiver of his right to appeal was not "knowing and intelligent."  Motion at 22.  In support, Defendant relies on Second Circuit decisions in the section 212(c) context establishing that section 1326(d)(1)'s exhaustion requirement "must be excused where an alien's failure to exhaust results from an invalid waiver of the right to an administrative appeal."  *Sosa*, 387 F.3d at 136; *accord Calderon*, 391 F.3d at 374-75 (explaining that a "failure to exhaust administrative remedies bars collateral review of a deportation proceeding under Section 1326(d)(1) only where an alien's waiver of administrative review is knowing and

intelligent" (quotations and alterations omitted)); *see also Copeland*, 376 F.3d at 71 ("Given that IJs have a duty to develop the administrative record, and that many aliens are uncounseled, our removal system relies on IJs to explain the law accurately to *pro se* aliens.  Otherwise, such aliens would have no way of knowing what information was relevant to their cases and would be practically foreclosed from making a case against removal.").

The Government responds by arguing that the Second Circuit decisions excusing an illegal reentry defendant's failure to exhaust if the waiver was not knowing and intelligent have been abrogated by the Supreme Court's recent decision in *Palomar-Santiago*.  Opposition at 31-32; *see also* Dkt. 54 at 3 (arguing that *Sosa* and *Calderon* "simply cannot be reconciled with the Supreme Court's decision in *Palomar-Santiago*").  In *Palomar-Santiago*, the Supreme Court examined Ninth Circuit precedent that excused a defendant's failure to meet the first two requirements of section 1326(d) if the defendant was convicted of an offense that did not in fact render the defendant removable.  141 S. Ct. at 1621.  The Supreme Court unanimously held that "[t]he Ninth Circuit's interpretation is incompatible with the text of § 1326(d)" because that section plainly provides that "defendants charged with unlawful reentry 'may not' challenge their underlying removal orders 'unless' they 'demonstrat[e]'" that the three requirements are met.  *Id.* at 1620. The three requirements "are connected by the conjunctive 'and,' meaning defendants must meet all three."  *Id.* at 1621.  Accordingly, the Supreme Court concluded, "each of the statutory requirements of § 1326(d) is mandatory."  *Id.* at 1622.  The *Palomar-Santiago* Court, however, reached this result purely as a matter of statutory construction, and expressly declined to address the defendant's constitutional arguments alleging "due process and separation of powers problems" because "they were not raised below and are outside the scope of the narrow question

th[e] Court granted certiorari to decide."[13]  *Id.* at 1622 n.4.  The aforementioned Second Circuit

decisions concerning section 212(c) were not grounded in a statutory reading of section 1326(d);

rather, the Second Circuit reached the results in those cases as a matter of constitutional due

process.  In light of the clear language in *Palomar-Santiago* limiting the scope of the Supreme

Court's holding to one of statutory construction, this Court cannot conclude that *Palomar-Santiago*

abrogated  the  Second  Circuit's  due  process-based  decisions  excusing  the  administrative

exhaustion requirement under section 1326(d)(1) where the noncitizen's waiver of appeal was not

knowing and intelligent.  The Second Circuit's decision in *Sosa*, for example, supports this

conclusion.

In *Sosa*, the defendant, who was charged with illegal reentry, moved to dismiss the

indictment on the ground that the immigration judge's failure to inform him of his eligibility for

section 212(c) relief during his removal hearing violated his right to due process.  387 F.3d at 135.

The district court denied the defendant's motion to dismiss because he failed to satisfy the first

two prongs of section 1326(d).  *Id.*  On appeal, the Second Circuit recognized that the exhaustion

requirement under section 1326(d)(1) is mandatory, *see id.* at 136, but found that the defendant

nevertheless was "excused from the administrative exhaustion requirement because his waiver of

administrative review was not knowing and intelligent."  *Id.* at 139.  According to the Second

Circuit, "[b]ecause Section 1326(d) was intended as a response to, and codification of, *Mendoza-*

---

[13]  The  Government  in  *Palomar-Santiago*  presented  a  narrow  question  on  appeal:
"[W]hether a defendant automatically satisfies all three of th[e] prerequisites [of section 1326(d)]
solely by showing that he was removed for a crime that would not be considered a removable
offense under current circuit law, even if he cannot independently demonstrate administrative
exhaustion or deprivation of the opportunity for judicial review."  Pet. for Writ of Cert., *United
States v. Palomar-Santiago*, No. 20-437, 2020 WL 5947898, at *i (Oct. 5, 2020); *see also* Gov't
Brief, 2021 WL 720352, at *6 n.1 (Feb. 22, 2021) ("The question presented in this case is limited
to the proper understanding and application of the procedural requirements in Section 1326(d)(1)
and (2).").

*Lopez*, its administrative exhaustion requirement must be subject to at least one significant exception to render it consistent with that decision." *Id.* at 136.  Thus, the Second Circuit in *Sosa* concluded, "[a] failure to exhaust administrative remedies bars collateral review of a deportation proceeding under Section 1326(d)(1) . . . only where an alien's waiver of administrative review was *knowing and intelligent*." *Id.* (emphasis added); *see Calderon*, 391 F.3d at 375 (finding that the noncitizen's waiver of his right to appeal was not knowing and intelligent and excusing the administrative exhaustion requirement under section 1326(d)(1) because the immigration judge incorrectly advised the noncitizen that he was barred from seeking section 212(c) relief).  As for the defendant in *Sosa*, the Second Circuit found that he did not knowingly and intelligently waive his right to an administrative appeal because he "was not informed of his right to apply for Section 212(c) relief." 387 F.3d at 137.  This was the case even though the immigration judge correctly applied the BIA's guidance at the time of the defendant's removal hearing and the BIA's interpretation of section 212(c) was overruled by the Supreme Court *after* the defendant's removal hearing.

Therefore, the Second Circuit in *Sosa* and related decisions in the section 212(c) context recognized that while the requirements under section 1326(d) are mandatory as a *statutory matter*, the statutory exhaustion requirement may be excused as a *constitutional matter* where the noncitizen's waiver of appeal was not knowing and intelligent.  Because the Supreme Court's holding in *Palomar-Santiago* was limited to statutory construction and did not address the constitutional concerns implicated in *Sosa* and other Second Circuit cases, Second Circuit precedent excusing the exhaustion requirement under section 1326(d)(1) where the waiver was not knowing and intelligent remains good law.  *See United States v. Herrera-Pagoada*, 14 F.4th 311, 320 n.8 (4th Cir. 2021) (noting that the Supreme Court in *Palomar-Santiago* "didn't consider the

effect of an invalid appeal waiver on an alien's burden to prove the first two prongs of § 1326(d)");
*but see Alam v. Garland*, 11 F.4th 1133, 1138 (9th Cir. 2021) (Bennett, J., concurring) (expressing
that none of the exhaustion excusal rules survive *Palomar-Santiago*).

The Government argues that the Second Circuit's exception to the mandatory exhaustion
requirement "would lead to incongruous results that Congress could not have intended when it
drafted Section 1326(d)."  Dkt. 54 at 3.  Specifically, the exception would allow a defendant who
waived further review of an aggravated felony classification in removal proceedings to collaterally
attack that classification under section 1326(d) on the theory that the waiver was not "knowing
and intelligent."  That is the situation before the Court in this case.  Yet, had that same defendant
instead exhausted his or her administrative remedies to challenge the classification, and had an
opportunity for judicial review, yet was not successful in that pursuit, section 1326(d) would bar
the defendant from collaterally challenging his or her removal and aggravated felony classification
in a subsequent illegal reentry prosecution.  *Id.*  The Court agrees that such an outcome seems
problematic and unfair to the second defendant, who would be disadvantaged as a result of
pursuing the required administrative process.   Indeed, it would be surprising if Congress intended
such a result, which may be inconsistent with notions of due process, the statutory text, and the
Supreme Court's holding in *Palomar-Santiago* that the requirements of section 1326(d) are
mandatory.  As the Supreme Court observed, "[t]he immigration judge's error on the merits does
not excuse the noncitizen's failure to comply with a mandatory exhaustion requirement if further
administrative review, and then judicial review if necessary, could fix that very error."  141 S. Ct.
at 1622.  While the Second Circuit may decide to revisit its earlier decisions excusing section
1326(d)(1)'s administrative exhaustion requirement where the noncitizen's waiver of appeal was
not knowing and intelligent, especially following *Palomar-Santiago*, the Court nevertheless must

follow that precedent, which remains binding on this Court and all other district courts in this Circuit.

The Court next must determine whether Defendant is excused from satisfying the exhaustion requirement because his waiver of his right to appeal the IJ's removal order was not knowing or intelligent. "The finding of knowing and intelligent waiver is inevitably a fact-specific inquiry." *Ali v. Mukasey*, 525 F.3d 171, 174 (2d Cir. 2008). Here, the record does not establish a knowing and intelligent waiver of the right to appeal. Defendant, a non-English speaker, appeared *pro se* before the IJ. Although an interpreter was present at the removal hearing, it does not appear that Defendant fully comprehended the nature of the immigration court proceeding. *See* Gutierrez-Campos Declaration ¶ 7 ("[W]hen I saw the immigration judge, I had little understanding of what was going on because I was unable to read the papers I was given. I understood the government wanted to deport me. I did not know any other outcome was possible."); Dkt. 55-1 (transcript with translation). Moreover, after finding Defendant removable, as discussed, the IJ failed to advise Defendant of his right to apply for voluntary departure, for which the Court has found he was eligible. Defendant contends that had he been made aware of the option to voluntarily depart, he would have sought such relief and likely would not have waived his right to appeal the IJ's decision ordering his removal. *See* Gutierrez-Campos Declaration ¶ 9 ("I did not appeal the judge's decision because the judge had just said he had an order to deport me. I thought there was no point to an appeal because the judge said there was no other outcome but deportation."). Accordingly, the Court concludes that the IJ's failure to advise Defendant of voluntary departure rendered Defendant's waiver of his right to appeal not knowing and intelligent, and Defendant is excused from satisfying the administrative exhaustion requirement under section 1326(d)(1).

### 3.  Deprivation of Judicial Review

With respect to the remaining requirement under section 1326(d)(2)—whether the removal proceedings "improperly deprived the alien of the opportunity for judicial review"—the Second Circuit has recognized that "an invalid waiver of the right to administrative exhaustion will often result from the same lack of understanding that renders a waiver of judicial review invalid." *Sosa*, 387 F.3d at 137; *see also Copeland*, 376 F.3d at 68 n.6 ("Where a waiver of the right to appeal is not knowing, an alien is deprived of the opportunity for judicial review.").  This, however, does not end the inquiry under the second prong because "[t]he availability of habeas review is sometimes deemed to constitute an opportunity for judicial review."  *Id.* at 68.  But because the "technical availability" of habeas review is not sufficient, even "where habeas review is potentially available, an opportunity for judicial review will still be deemed to have been denied where the interval between entry of the final deportation order and the physical deportation is too brief to afford a realistic possibility of filing a habeas petition."  *Id.* at 68-69.  The Second Circuit has found that a period of less than one month after entry of the final deportation order and before the deportation is insufficient to provide an uncounseled noncitizen a realistic possibility of seeking judicial review through a habeas petition.  *Sosa*, 387 F.3d at 138.

Here, the immigration judge ordered Defendant removed on July 18, 2000 and Defendant was removed to Mexico on July 25, 2000.  This one-week period was insufficient to provide Defendant a realistic possibility of seeking judicial review through a habeas petition.  Accordingly, Defendant was deprived of the opportunity for judicial review under section 1326(d)(2).

\* \* \*

In sum, because the Court finds that the IJ who presided over Defendant's removal proceedings committed a fundamental procedural error by failing to inform Defendant of his

eligibility for voluntary departure, thereby denying him the opportunity to apply for such relief from removal, and Defendant was prejudiced by that error, the removal order entered by the IJ was fundamentally unfair.   The other requirements of section 1326(d) are also satisfied because, under prevailing Second Circuit precedent, Defendant did not knowingly and intelligently waive his right to appeal the IJ's removal order and he was denied a realistic possibility of seeking judicial review.

## IV. Conclusion

For the foregoing reasons, Defendant's motion to dismiss the Information is granted and the Information is dismissed.   The Clerk of Court is respectfully directed to terminate the motion pending at Dkt. 19 and to close this case.

SO ORDERED.

Dated: January 31, 2022
     New York, New York

JOHN P. CRONAN
United States District Judge